UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X

ZARITA DEAS,

                        Plaintiff.

    -against-

COMMISSIONER OF SOCIAL SECURITY,

                        Defendant.

------------------------------------------------------------------- X

04 CV 4552 (ARR)

NOT FOR
PUBLICATION

OPINION
AND ORDER

ROSS, United States District Judge:

Plaintiff pro se, Zarita Deas ("Ms. Deas" or "plaintiff"), brought this action on behalf of

her minor son, Jahkori Makai Washington ("Jahkori"), pursuant to 42 U.S.C. § 405(g) for

judicial review of the decision of the Commissioner of the Social Security Administration

("SSA" or "Commissioner"), dated May 7, 2003, finding Jahkori ineligible for Supplemental

Security Income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-

1383f. Plaintiff initiated this action by complaint filed on October 18, 2004. Defendant has

moved for judgment on the pleadings pursuant to Rule 12(c). Plaintiff has cross-moved for

judgment on the pleadings. For the reasons stated below, the court denies defendant's motion for

judgment on the pleadings, grants plaintiff's cross-motion for judgment on the pleadings,

reverses the Commissioner's decision, and remands the case for further proceedings.

## BACKGROUND

A. Procedural History

Plaintiff, on behalf of her son Jahkori, applied for SSI benefits on March 16, 2001,

alleging that her son has been disabled since his birth on August 24, 2000. R. 37.[1] Plaintiff claimed that her son suffered from hypertonia and severe perinatal asphyxia, caused by a knot in the umbilical cord. R. 42. These claims were denied, R. 27, and plaintiff requested and was granted a hearing before an ALJ. See 20 C.F.R. § 404.906(b)(4) (2005) (eliminating reconsideration step in test cases). The hearing took place before ALJ Peter J. Baum on February 19, 2003. R. 418. Plaintiff appeared pro se. Id. By decision dated May 7, 2003, the ALJ found that Jahkori was not disabled within the meaning of the Social Security Act and therefore not entitled to SSI benefits. R. 20. The Appeals Council denied plaintiff's request for review on October 2, 2004, making the ALJ's May 7, 2003 decision the final decision of the Commissioner. R. 2. The instant action was timely commenced.

B. Testimonial Evidence

At the hearing before the ALJ, plaintiff testified that Jahkori, who was 2 ½ years old at the time, was admitted to the hospital a number of times in the year before the hearing for fevers, colds, one instance of dehydration, a laceration to his foot, and a burn injury on his right arm. R. 426. She also testified that Jahkori was receiving occupational therapy in an early intervention program, which he attended 2 ½ hours per day, five days per week. R. 427, 432. She stated that he was making "a little bit of progress" in the program, but he continued to have behavioral problems, including temper tantrums, constant crying, scratching himself, banging his head on the floor, and attacking her. R. 428-49. According to plaintiff, Jahkori clings to her all the time, attacks his older sister, does not like to have friends or relatives visit the home, and does not respect his sister's belongings. R. 433, 436. He also "really acts out on the train," spitting,

---

[1] "R." refers to the administrative record filed with the court by defendant Commissioner.

2

clawing, and scratching other people. R. 438. Plaintiff further testified that her son's behavior was "frustrating" and "really hard on [her]." R. 440.

C. Medical and Related Evidence

Jahkori was born on August 24, 2000 after 41 ½ weeks of gestation. R. 86. At birth, he was diagnosed with severe perinatal asphyxia and respiratory distress due to a knot in his umbilical cord. R. 87. He was discharged from the hospital on August 29, 2000. R. 94. Plaintiff was told to follow-up with the neurology clinic for continuing treatment. Id.

On January 17, 2001, Dr. Robin E. Smith, a pediatric neurologist, ordered an MRI examination of Jahkori's head. Dr. Han Kim conducted the MRI and concluded that it was "unremarkable." R. 141.

On February 9, 2001, Dr. Ingrid Roze and others affiliated with the NYC Early Intervention Program ("EIP") and the Therapy and Learning Center ("TLC") performed a multi-disciplinary evaluation of Jahkori, who was 5 ½ months old at the time. R. 154. Dr. Roze remarked that Jahkori "presented with overall skills that are well within adjusted age expectations." Id. In addition, she concluded that "[c]ognitive, communication, physical[,] and social emotional development is well within expectation." Id. She also stated that he had "increased muscle tone throughout." Id.

Pam Cotto, a special educator, also evaluated Jahkori on February 9, 2001. In general, she concluded that he "presented as an alert and happy baby who responded well to interactions and handling by evaluators." R. 157. Regarding his physical development, Cotto observed "some tightness in his legs," but she concluded that "it did not appear to affect his development." Id. However, she recommended a physical therapy evaluation "to rule out any physical delays."

3

Id. In spite of concluding that "Jahkori's fine motor development appeared within age expectations," Cotto also recommended an occupational therapy evaluation. Id. With regard to his communication skills, Cotto stated that "Jahkori's receptive and expressive language development appeared at or above age expectations." R. 158. Due to parental concerns, Cotto recommended a speech and language evaluation. Id. Cotto also concluded that Jahkori's social/emotional, self-help, and cognitive development appeared well within age expectations. Id. After completing her evaluation, Cotto determined that Jahkori did not require special instruction. Id.

Robyn Pamela Uslip, a speech language pathologist, also evaluated Jahkori on February 9, 2001. R. 160. After examining Jahkori, she concluded that he functioned at the 8-9 month range receptively and the 6 month range expressively. R. 162. Because he was exhibiting average or above average receptive and expressive language skills at the time, Uslip did not recommend speech and language therapy. Id.

On the same day, Susan K. Curcio, an occupational therapist, evaluated Jahkori. R. 163. After examining Jahkori, she concluded that he "presents with increased muscle tonus," but "this does not appear to limit his functioning at present. R. 164. Consequently, Curcio did not recommend occupational therapy. Id.

Kevin Loughlin, a physical therapist, also examined Jahkori on February 9, 2001. Tr. 166. He found that "Jahkori presents with increased stiffness throughout his trunk and extremities." Id. Although Loughlin determined that Jahkori's "passive range of motion is within normal limit limits," he also found that "it requires a maintained stretch to loosen Jahkori's muscles." Id. In spite of his finding of increased stiffness, Loughlin concluded that

4

Jahkori was functioning at an above average gross motor level and the stiffness had not decreased his range of motion. R. 167. Thus, Loughlin did not recommend physical therapy. Id.

On March 27, 2001, Dr. Smith examined Jahkori and diagnosed him with hypertonia in the lower extremities. R. 90, 108. Dr. Smith recommended physical therapy twice per week for his legs and Early Intervention. R. 88, 90, 109.

On May 23, 2001, Dr. Emma Florez examined Jahkori. R. 176. Based on a physical exam, Dr. Florez determined that Jahkori was a "well-developed, fairly well nourished, alert, afebrile child in no acute distress." R. 177. She observed a "[s]light increase of muscle tone in the lower extremities." R. 178. She concluded that his gross motor, language, social, and fine motor skills were normal for his age, and hypertonia had not affected his development. Id. Moreover, she stated that Jahkori's "hypertonia should improve with therapy to be given at Wyckhoff Hospital." Id.

On June 7, 2001, Dr. V.B. Gupta, a state agency physician, reviewed Jahkori's medical records and opined that he had a "developmental delay." R. 180. Although he concluded that the "impairment or combination of impairments is severe," he determined that it "d[id] not meet, medically equal, or functionally equal" the definition of a disability in the regulatory listings. Id. Of the six domains, Dr. Gupta opined that Jahkori had no limitations in five: acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and caring for himself. R. 182-83. Dr. Gupta determined that Jahkori exhibited a less than marked limitation in the sixth domain, health and physical well-being, due to "mild hypertonia of the lower extremities." Id.

On June 12, 2001, plaintiff sought a second opinion from physicians at the Stanley S.

5

Lamm Institute for Child Neurology and Developmental Medicine ("Lamm Institute"). R. 249. After conducting an intake interview, Iris Gersten, a social worker, recommended a neurological exam. R. 251. On June 20, 2001, Dr. Adrian Logoush conducted a neurological exam of Jahkori. He concluded that Jahkori was "a normally developing toddler with minimal hypertonicity in the lower extremities presenting as an adductor catch." R. 247. He further noted, however, that "[c]hildren with transient hypertonicity have been documented to be at an increased risk for various developmental abnormalities including speech; fine motor; [and] adaptive behavioral problems." Id.

On July 15, 2002, Jahkori was re-examined by professionals affiliated with TLC. R. 253. After conducting a psychological exam of Jahkori, then 22-23 months old, Dr. Roze concluded that he was functioning "significantly below age expectations as per the Bayley [Scales of Infant Development]." R. 255. Overall, her examination indicated that Jahkori was functioning at the 15-month age equivalent, or a 30% delay, as per Bayley. Id. Dr. Roze further estimated that Jahkori's language development was within the 12-14 month age range (over 33% delayed); his cognitive development was within the 15-16 month age range (at least 25-33% delayed); his motor development was within the 18-20 month age range; his social emotional development was within the 18-20 month age range; and his daily living skills were within his age range. Id. Dr. Roze observed that "Jahkori presents with significant behavioral difficulties, including temper tantrums, screaming, etc[.] within the home and with his family." Id. She further noted that "Jahkori is a child with a significant developmental immaturity, especially in the areas of communication and visual motor development, which is likely exacerbating aspects of emotional development, including affective regulation, sensory-integration and attachment." Id. Based on

6

her findings, Dr. Roze recommended special instruction, a speech and language evaluation, an occupational therapy evaluation, and parent-child counseling. R. 257.

Pursuant to Dr. Roze's recommendation, Kerri A. Kubicz-Schaefer, a speech-language pathologist, performed a speech language evaluation on Jahkori on July 15, 2002. R. 258. Ms. Kubicz-Schaefer observed that Jahkori had tantrums and cried during transitions to different activities, grabbed desired items instead of using communicative intent, and demonstrated a limited attention span. R. 260. She concluded that he "exhibits moderate-severe delays in receptive and expressive language" and that he functioned at the 12-15 month age range receptively and the 9-12 month age range expressively. Id. She recommended that Jahkori receive speech-language therapy three times per week. Id.

Rachel Schwartz, an occupational therapist, also examined Jahkori on the same day. R. 262. She could not formally assess Jahkori's neuromuscular status "due to level of cooperation." Id. Nonetheless, she concluded based on her own observations that "muscle tone and range of motion are within normal range." Id. She also noted that "Jahkori appears to have deficits in the area of sensory modulation/regulation and arousal" and "sensitivities with regard to tactile (touch) input." R. 263. She determined that Jahkori's fine motor skills were below the 18-23 month range, but she could not obtain a specific age range due to "Jahkori's refusal to participate in certain activities." Id. Ms. Schwartz recommended occupational therapy to address the deficits she observed. Id.

On August 6, 2002, a professional at TLC[2] prepared an individualized family service plan

---

[2] The plan appears to be prepared by Barbara Deeb, clinical coordinator at TLC and a speech language pathologist, see R. 252, on Dr. Roze's behalf.

for plaintiff and Jahkori. R. 73. She reported that Jahkori gets frequent ear infections and is slightly underweight, but otherwise physically healthy. Id. With regard to his gross and fine motor skills, she noted that Jahkori can't open doors with door knobs, can't open lids on containers unless they are very loose, and can't string beads. Id. She noted that Jahkori is a "picky eater" and cannot feed himself with a spoon, but allows his mother to feed him. Id. As for other adaptive skills, the professional noted that he is not toilet trained and does not indicate when his diaper is soiled. In addition, she reported that he attempts to remove his own clothes, but does not assist with dressing. Id. The professional also made notations about his communication skills, indicating that he could say few words, but often yells and screams. R. 74. With regard to his cognitive skills, she noted that Jahkori "demonstrates some problem solving skills" and "engages in some functional play," but engages in aggressive rather than meaningful play with some of his toys. Id. She also noted, in relation to Jahkori's social and emotional skills, that he displays aggression toward adults and children and only "sometimes" enjoys affection from his mother. Id. According to the report, Jahkori was to receive special instruction, speech and language therapy, occupational therapy, and counseling. R. 75, 80.

On November 4, 2002, after participating in EIP for several weeks, Anna Rose Hart, one of Jahkori's teacher's at TLC, wrote a note to plaintiff stating that Jahkori "continues to do well in the class activities and he is learning to say more and more." R. 271. In addition, she noted that "he's made nice relationships with each of his therapists." Id. She noted that Jahkori was still have trouble with his toilet training, but that he was doing well in all other areas. R. 271-72. In another undated note to plaintiff, however, Ms. Hart explained that "Jahkori does act out at times in class." R. 282. Also in an undated note to plaintiff, Maureen Del Vacchia, an

8

occupational therapist at TLC, commented that Jahkori "has been doing great" and "there are no significant sensory processing difficulties," but "he has some difficulty transitioning back to class." R. 279.

In April and May of 2003, TLC conducted another multi-disciplinary evaluation of Jahkori, who was 32 months old at the time. R. 334. In a summary report, Jahkori was classified within the 27 month age range based on the Bayley Scale of Infant Development, which represented a delay of less than 25%. R. 338. Jahkori's socialization skills were considered within normal limits based on the Vineland Adaptive Behavior Scale. Id. However, the report expressed concern about Jahkori's social functioning due to his aggressive behavior at home and in school. Id. Jahkori's fine and gross motor skills were also classified as age appropriate. Id.

Clint Wells, a speech and language therapist, whose findings were included in the report, concluded that "Jahkori has excellent oral motor skills," but remains "below the lower limit of age appropriate" expectations. R. 335-36. Wells noted that "[h]is receptive and expressive language skills have improved and he continues to pick up concepts at a quick pace." R. 336. Wells recommended continued speech and language therapy twice a week. Id.

Ms. Hart, Jahkori's teacher at TLC, also submitted observations of Jahkori's classroom experience in the report. R. 341. She reported that Jahkori "exhibited little difficulty" removing his outerwear when he arrived to class, but he "exhibited great difficulty while waiting for his peers to arrive." Id. She noted that he "moved about in his chair and turned himself around in the chair and seemed to be unaware of the waiting song that all of his peers were partaking in." Id. She also observed that Jahkori "appeared to be angry with the teacher" at one point and even "attempted to strike out at the teacher." Id. In addition, Ms. Hart noted that "Jahkori exhibited

some difficulty with waiting his turn" and interrupted his classmates during one of the games they played. Id. She also observed, however, that Jahkori was able to follow some of the teacher's directives during the class. Id.

Ms. Del Vecchia, an occupational therapist, whose findings were also included in the report, concluded that Jahkori's neuromuscular strength and range of motion were within normal limits. R. 347. She also determined that Jahkori displayed age appropriate gross and fine motor skills. Id. However, she noted that Jahkori's "greatest difficulty during testing was his impatience between tasks and his frustration with himself when unsuccessful with a task." Id. She also determined that Jahkori had "no significant sensory processing issues." Id. As a result of her evaluation, she did not recommend further occupational therapy, but did suggest continued counseling/play therapy. Id.

Eliane Kaimeh, a certified school psychologist, performed a psychological evaluation of Jahkori, which was also included in the TLC report. R. 352. Based on her own observations, Dr. Kaimeh reported that Jahkori "presented as initially distracted ... [and] inattentive to the evaluator's directives." Id. However, she noted that he "became calmer and more focused" as the evaluation progressed. R. 353. She also noted that, although he talked throughout the evaluation, he "was not always intelligible." Id. Dr. Kaimeh administered the Bayley and Vineland tests discussed above. She concluded that he was mildly delayed based on Bayley, with an age equivalence of 27 months, or less than a 25% delay. Id. Based on the Vineland test, Dr. Kaimeh concluded that Jahkori had adequate motor and socialization skills, but scored in the moderately low range for communication, daily living, and adaptive behavior. Id. She further noted that "[w]hile Jarkhori has made reported gains in interpersonal skills, his overall

10

social/emotional functioning is still of concern due to aggressive behaviors reported at home, and his intense tantrums at school." R. 355. Based on her findings, she recommended continued educational and therapeutic support to address his cognitive, language, and social/emotional needs. Id. Dr. Kaimeh further recommended that Jahkori be placed in a 12-month school. R. 356. She justified her recommendation by noting that Jahkori regresses between short and long breaks in the school year, that he requires maximum adult assistance, and that he has a low frustration tolerance. Id.

On July 8, 2003, the New York City Board of Education ("NYCBE") approved Jahkori for another year of special education. R. 307. In the approval report, the NYCBE also provided an extensive assessment of Jahkori's development. With regard to Jahkori's academic performance, the report noted that he enjoys task-oriented and imaginative play sequences. R. 309. The report noted that he often prefers to play alone, but "peer engagement skills have been emerging." Id. The report also noted that Jahkori is "highly distractable," "exhibits disorganization," and "exhibits regressive behaviors (i.e., crying, whining, and hitting)." Id. The NYCBE also appeared to report Jahkori's Bayley score from TLC, which suggested that his development was mildly delayed. R. 310. As for his language skills, the report noted that "[h]e currently displays a slight deficit with receptive and expressive language." R. 311. According to the report, Jahkori displayed an understanding of simple pronouns, spatial concepts, and could identify objects, body parts, and action words. Id. However, the report noted that he displayed "difficulty understanding the use/function of objects and identifying part/whole relationships." Id. With regard to his social and emotional development, the report noted that Jahkori has "a tendency toward anger," "exhibits difficulty with transit[i]ons [sic]," and "exhibits regressive

11

behaviors during transitions." R. 312. The report further stated that Jahkori has a difficult time regulating different affective responses, and moves too quickly from anger to laughter to sadness. Id. In addition, the report noted that Jahkori often has temper tantrums, particularly "around change and transitions." Id. Although the report characterized Jahkori as a "distractible and impulsive child who needed maximum prompting and redirectioning," it recognized that he "grew calmer as the evaluation progressed." R. 313. With regard to his health and physical development, the NYCBE report remarked that Jahkori "is in good health" and that his "fine and gross motor skills are developing at an age appropriate rate." R. 314. The report also included a Behavior Intervention Plan, which noted that "Jahkori exhibits decreased attention, self-regulatory weakness, difficulty accepting limits, and maintaining pro-social behavior." R. 323. The report recommended a small, highly structured classroom environment, individualized instruction, a twelve-month program, speech and language therapy, occupational therapy, and counseling to address Jahkori's developmental problems. R. 324-26.

On July 31, 2003, plaintiff gave notice to TLC that she would be pulling Jahkori out of its pre-kindergarten disability program as of August 1, 2003. R. 360.

On February 10, 2004, Dr. Susan E. Gottleib at the Brooklyn Hospital Center examined Jahkori. R. 331. She noted that Jahkori "presented as a well developed and well nourished child in no acute distress." Id. She also observed that Jahkori exhibited "defiant behavior through the session." Id. She further noted that Jahkori's "behavior[] escalated until he threw a pocketbook at the examiner." Id. Dr. Gottleib concluded that "Jahkori is a 3 ½ year old with developmental and behavioral problems," but she noted that it was unclear "how much continuity there is between behavior at home and at school." R. 331-32. According to her evaluation, such a

finding is necessary to establish a diagnosis of behavioral or developmental disorders, such as attention deficit hyperactivity disorder. R. 332. Dr. Gottleib recommended follow-up evaluations and certain management strategies for dealing with Jahkori's behavior. Id.

D. Appeals Council Decision

The Appeals Council "considered the reasons [plaintiff] disagree[d] with the [ALJ's] decision and the additional evidence" submitted by plaintiff, finding that there was no reason to review the ALJ's decision. R. 2. Accordingly, plaintiff's request for review was denied.

## DISCUSSION

A. Standard of Review

The Social Security Act provides that "the findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In reviewing a denial of disability benefits, therefore, a court may not determine disability de novo, see Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000), but may reverse a finding of the Commissioner only if that finding is not supported by substantial evidence in the record. See 42 U.S.C. §§ 405(g), 1383(c)(3). This substantial evidence test applies not only to the Commissioner's findings of fact, but also to the inferences and conclusions to be drawn from those facts. See Carballo ex rel. Cortes v. Apfel, 34 F.Supp.2d 208, 214 (S.D.N.Y.1999).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). In determining whether the administrative findings are supported by substantial evidence, the reviewing court must "examine the entire record, including contradictory evidence." Brown v. Apfel, 174 F.3d 59, 62 (2d

13

Cir.1999). Although the Commissioner need not have reconciled every conflict, see Miles v. Harris, 645 F.2d 122, 124 (2d Cir.1981), "crucial factors ... must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir.1984).

When a claimant is unrepresented at the administrative hearing, as was the case here, the ALJ is under a heightened duty "to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir.1990) (internal quotation marks and citations omitted). The Second Circuit has noted that the application of the burden of proof is "'particularly elusive in cases involving social security benefits,' in part because the proceedings 'are not designed to be adversarial' and certainly are not likely to be such when the claimant, as here, is unrepresented." Donato v. Secretary of the Dep't of Health and Human Servs., 721 F.2d 414, 418 (2d Cir. 1983) (quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)).

B. Governing SSA Regulations for Defining Childhood Disability

To qualify for disability benefits, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). Pursuant to this statute, the SSA has enacted a three-step sequential analysis to determine whether a child is eligible for SSI benefits on the basis of a disability. 20 C.F.R. § 416.924(a). First, the ALJ considers whether the child is engaged in "substantial gainful activity." Id. at § 416.924(b). Second, the ALJ considers whether the child has a "medically

14

determinable impairment that is severe," which is defined as an impairment that causes "more than minimal functional limitations." Id. at § 416.924(c). If so, the ALJ must then consider whether the impairment "medically equals" or "functionally equals" a disability listed in the regulatory "Listing of Impairments." Id. at § 416.924(c)- (d); id. at pt. 404, subpt. P, app. 1.

The functional equivalence analysis requires an inquiry into a child's functioning in "six domains." Id. at § 416.924a(b)(1); see also Pollard v. Halter, 377 F.3d 183, 190 (2d Cir. 2004). These six domains include (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. Id. at § 416.926a(b)(1)(i)-(vi). In order to demonstrate functional equivalence, the child must exhibit a "marked" limitation in two domains, or an "extreme" limitation in one domain. Id. at § 416.926a(a). An impairment is a "marked limitation" if it "interferes seriously with [a person's] ability to independently initiate, sustain, or complete activities." Id. at § 416.926a(e)(2)(i). If a child has not yet attained age 3, which is the case here, a "marked limitation" means that the child is "functioning at a level that is more than one-half but not more than two-thirds of [the child's] chronological age." Id. at § 416.926a(e)(1)(ii). An "extreme limitation" is defined as a limitation that "interferes very seriously with [a person's] ability to independently initiate, sustain, or complete activities." Id. at § 416.926a(e)(3)(i). Where, as here, the child has not yet attained age 3, an "extreme limitation" generally means that the child is "functioning at a level that is one-half [the child's] chronological age or less." Id. at § 416.926a(e)(3)(ii).

C. New Evidence

Where new and material evidence relating to the period on or before the date of the ALJ's

decision is submitted to the Appeals Council with the request for review, the Appeals Council must "evaluate the entire record including the new and material evidence submitted . . . [and] review the case if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently in the record." See id. at § 404.970. When the Appeals Council denies review of the ALJ's decision, the new evidence submitted to the Appeals Council becomes part of the administrative record for judicial review. 42 U.S.C. § 405(g); see also Perez v. Chater, 77 F.3d 41 (2d Cir. 1996). The court reviews the entire administrative record, including the new evidence, and determines whether there is substantial evidence to support the Commissioner's decision. Here, plaintiff presented additional evidence—including the New York City Board of Education Report dated July 8, 2003 and the multi-disciplinary report by TLC dated April and May 2003—to the Appeals Council that was not considered by the ALJ.[3] R. 3. Thus, those reports are part of the entire record that the court will consider in reviewing the Commissioner's decision.

## D. The Merits of Plaintiff's Claims

In conducting the three-step sequential analysis required under SSA regulations, see 20 C.F.R. § 416.924(a), the ALJ determined that plaintiff satisfied step one of the analysis, finding that Jahkori had not engaged in "substantial gainful activity" since the onset of his alleged disability. R. 15. He also concluded that plaintiff fulfilled that second step, finding that

---

[3] Plaintiff apparently submitted a videotape documenting Jahkori's behavior to the Appeals Council. See R. 3. The Appeals Council did not review the tape, but offered to consider a written description of the videotape provided such a description was submitted within 30 days of the Appeals Council decision. Id. Plaintiff appears to have submitted the written description by the prescribed deadline. See Defendant's Notice of Motion for Judgment on the Pleadings Ex. A at 26-31. The description, however, is not is not included in the administrative record submitted to the court.

Jahkori's developmental receptive/expressive language disorder constitutes a severe impairment under the regulations. Id. However, the ALJ denied plaintiff SSI benefits because he concluded that plaintiff failed to satisfy the third step of the analysis, determining that Jahkori's impairment was not medically or functionally equivalent to any of the impairments in the regulatory listings. R. 19.

On the issue of functional equivalence, the ALJ determined that Jahkori had no limitation in two domains: attending and completing tasks and moving about and manipulating objects. R. 17-18. The ALJ did find a marked limitation in the domain of interacting and relating to others. R. 17. Furthermore, the ALJ determined that Jahkori exhibited less than marked limitations in the remaining domains: acquiring and using information; caring for oneself; and health and physical well-being. R. 16, 18-19. The court finds that the ALJ's reasoning with regard to three domains—(1) interacting and relating to others; (2) acquiring and using information; and (3) caring for oneself—did not sufficiently acknowledge and weigh the conflicting evidence contained in the record. The ALJ also rejected evidence and testimony by various witnesses without making the requisite credibility findings or identifying evidence that could justify rejecting such evidence or testimony. Moreover, the ALJ did not consider the supplemental evidence submitted the Appeals Council, which is now part of the record and sheds more light on Jahkori's condition during the relevant period.

1. *Interacting and Relating To Others*

In support of his finding that Jahkori has a marked limitation in the domain of interacting and relating to others, the ALJ noted that the speech pathology report dated July 15, 2002 revealed moderate to severe delays in Jahkori's receptive and expressive language skills. R. 17.

17

In addition, the ALJ credited plaintiff's testimony about Jahkori's behavior at home, which suggested that Jahkori only interacted with his mother at home, that he often scratches, hits, and kicks his older sister, and that he does not like it when friends and family visits the home. Id. However, the ALJ also noted that the multi-disciplinary report dated February 9, 2001—when Jahkori was only 5 ½ months old—revealed no limitation. Id. Moreover, the ALJ emphasized informal reports from Jahkori's teachers and therapists that apparently suggested "he [was] maintaining very nice relationships with each of his therapists and doing very well in speech therapy.... [and] he was able to take turns and participate in group activities." Id.

In determining that Jahkori's difficulty interacting with others was merely a marked limitation, the ALJ failed to explain why he discounted strong objective evidence that Jahkori had a significant impairment in his language skills. On July 15, 2002, when Jahkori was 22-23 months old, the speech language pathologist found that he functioned in the 12-15 month age range receptively and the 9-12 month age range expressively. R. 260. These findings suggest that his overall language skills were potentially equivalent to that of a child half his age or less, which suggest an extreme limitation under SSA regulations. Nonetheless, the ALJ credited the multi-disciplinary study conducted when Jahkori was only 5 ½ months old, which revealed no language limitation. The ALJ failed to explain the relevance of the earlier findings and why those findings appear to outweigh the objective evidence of Jahkori's communication difficulties documented in the July 2002 report.

In terms of qualitative evidence, the ALJ fails to mention evidence of Jahkori's difficulties interacting with his therapists, teachers, and classmates. The ALJ noted that Jahkori had "nice relationships" with his therapists, but did not mention that Ms. Schwartz, an

18

occupational therapist, could not complete her evaluation of Jahkori on July 15, 2002 due to his lack of cooperation. R. 263. He also failed to note that Jahkori's speech-language pathologist, Ms. Kubicz-Schaefer, observed Jahkori "tantrum and cry during transitions of activities and grab desired items instead of using some type of communicative intent." R. 260. Moreover, the ALJ mentioned the positive notes written by Jahkori's teacher, Ms. Hart, but he did not point out another communication from her that suggested that Jahkori "acts out at times in class." R. 282. The ALJ also discounted plaintiff's testimony about her son's behavior at home, finding it only "partially credible" because "[t]he acting out behaviors and tantrums reported in the home are either absent in school, or easily resolved by redirection." R. 19. The evidence in the record directly contradicts the ALJ's statement here. As indicated above, there was substantial evidence that Jahkori exhibited behavior at school similar to his behavior at home. The ALJ failed to explain why he discounted plaintiff's testimony about her son's behavioral problems in favor of teacher's, which appear to be written to reassure a worried parent rather than to rigorously evaluate a child's development.

The additional evidence submitted by plaintiff to the Appeals Council also suggest significant problems interacting with others. Ms. Hart, Jahkori's teacher, provided a more detailed report of Jahkori's classroom experience suggesting that Jahkori does not interact well with teachers or other students. See R. 341-42. She even reported that Jahkori attempted to hit the teacher at one point. R. 341. Moreover, she noted that he did not participate in the group activities, "unaware" of an group song at one point and interrupting his classmates during another game. Id. Ms. Del Vecchia, an occupational therapist, noted that Jahkori's "greatest difficulty" was his "impatience" and "frustration." R. 347. Eliane Kaimeh, a psychologist, expressed

19

concern due to the fact that Jahkori talked but "was not always intelligible." R. 353. She further noted that "his overall social/emotional functioning is still of concern due to aggressive behaviors reported at home, and his intense tantrums at school." R. 355 (emphasis added). Moreover, Ms. Kaimeh recommended a 12-month school for Jahkori because he "regresses between short and long breaks in the schools year" and "has a low frustration tolerance." Id. The report from the NYCBE similarly suggests that Jahkori has tendency toward anger and aggression, particularly during transition periods. R. 312. The report further stated that Jahkori often has temper tantrums and has a difficult time regulating his affective responses, swiftly moving from anger to laughter to sadness. Id. The supplemental evidence submitted to the Appeals Council is consistent with plaintiff's testimony about her son's tantrums and the earlier evidence suggesting that Jahkori has serious language and behavioral impairments and should have been sufficient to trigger review of the ALJ's decision.

## 2. Acquiring and Using Information

In support of his finding that Jahkori has a less than marked limitation acquiring and using information, the ALJ relied on the multi-disciplinary report dated February 9, 2001, which revealed no limitation in this area when Jahkori was 5 ½ months old. R. 16. In addition, the ALJ cited an early intervention teacher's report that Jahkori was doing well in class and assisted his classmates in making cupcakes. Id. He also noted that reports indicated Jahkori responds to his own name, refers to things around him by pointing, and is mastering three-word sentences. Id. Relying on the July 15, 2002 multi-disciplinary evaluation, the ALJ noted that Jahkori responds to simple directions, imitate actions, and can complete a pegboard once shown how to do so. Id.

Similar to the ALJ's analysis of Jahkori's ability to interact with others, the ALJ placed

great weight on the February 2001 multi-disciplinary evaluation without explaining its relevance, particularly because it was conducted when Jahkori was only 5 ½ months old. Moreover, the ALJ did not address the significant quantity of evidence in the record indicating impairment in Jahkori's intellectual functioning. The ALJ entirely ignored the multi-disciplinary report dated July 15, 2002, in which Dr. Roze found that Jahkori's cognitive development was within the 15-16 month range or delayed by at least 25-33%. R. 255. On its own, Jahkori's score suggests a less than marked limitation under SSA regulations. However, the ALJ does not appear to have considered the objective evidence of Jahkori's speech and language delay in his analysis of the child's ability to acquire and use information. Under SSA regulations, proper analysis of this domain requires an assessment of the child's speech and language abilities. See Kittles ex rel. Lawton v. Barnhart, 245 F.Supp.2d 479, 491 (E.D.N.Y. 2003); Thompson v. Barnhart, 02 Civ. 4930, 2004 WL 896663, * 7 (E.D.N.Y. Mar. 26, 2004). More specifically, a child of Jahkori's age "should begin to respond to increasingly complex instructions and questions, and to produce an increasing number of words and grammatically correct simple sentences and questions." 20 C.F.R. § 416.926a(g)(2)(ii). Although the ALJ mentions that Jahkori was "beginning to master three word sentences," R. 16, he failed to note that Ms. Schaefer, a speech-language pathologist, reported that Jahkori exhibited moderate-severe delays in his receptive and expressive language skills. R. 258. Ms. Schaefer found that he "did not attend or identify pictures/actions, follow simple directions without cues, or understand new words easily." R. 259. Moreover, she noted that he used limited approximations or verbalizations during play activities and did not imitate any words modeled by the clinician. Id. These factors led the speech language pathologist to conclude that Jahkori—22 months old at the time— was functioning at a 12-15 month age range

receptively and a 9-12 month age range expressively. R. 260. Jahkori's cognitive and language-related limitations cannot collectively be dismissed as less than marked if the impairments in combination may amount to a marked limitation. See 20 C.F.R. § 416.926a(e)(2)(i) (explaining that "day-to-day functioning may be seriously limited when [the] impairment(s) limits only one activity or when the interactive and cumulative effects of [the] impairments limit several activities").

The supplemental evidence before the Appeals Council also suggested that Jahkori displayed continuing difficulties with his speech and language skills. The multi-disciplinary evaluation dated April and May of 2003 reported that Jahkori's receptive and expressive language skills were improving, but still remained below the lower limit for his age group. R. 335-36. Moreover, Dr. Kaimeh concluded that Jahkori was not always intelligible when he spoke and recommended further educational and therapeutic support to address his cognitive and language difficulties. R. 355. The NYCBE report also provided a detailed assessment of Jahkori's cognitive and language abilities, noting that he displayed an understanding of simple pronouns and spatial concepts, but failed to comprehend the use and function of objects and the part/whole relationships of objects. R. 311. The evidence before the Appeals Council should have been sufficient to trigger a review of the ALJ's determination that Jahkori's ability to acquire and use information was merely less than marked.

3. *Caring for Oneself*

In his assessment of Jahkori's ability to care for himself, the ALJ again relied the multi-disciplinary report dated February 9, 2001, which revealed no limitation in this area. R. 18. He also relied on plaintiff's testimony that her son threw frequent tantrums and often attacked his

older sister. Id. However, the ALJ ultimately concluded that Jahkori exhibited a less than marked limitation in this area based on reports of teachers and therapists describing Jahkori as a "very sweet boy who does well in class, transitions between activities without difficulty, and doing [sic] a better job of communicating his needs with his expanding vocabulary." Id.

The ALJ did not address a significant quantity of evidence suggesting that Jahkori was impaired in his ability to care for himself. Under SSA regulations, caring for yourself requires that a child "tr[ies] to do more things for [himself] that increase[s] [his] sense of independence and competence in [his] environment." 20 C.F.R. § 416.926a(k)(2)(ii). A child "should be learning to cooperate with [his] caregivers when they take care of [his] physical needs, but [he] should also show what [he] can do; e.g., pointing to the bathroom, pulling of [his] coat." Id. In addition to plaintiff's extensive testimony about Jahkori's behavior at home, there is a great deal of evidence from teachers and therapists suggesting that he lacked independence. Ms. Schaefer, his speech-language pathologist, observed Jahkori's tantrums and crying during transitions of activities. R. 260. Moreover, Ms. Schwartz, an occupational therapist, could not properly examine Jahkori due to his lack of cooperation. See R. 262-63. Ms. Del Vacchia, another occupational therapist, noted that Jahkori "has some difficulty transitioning back to class." R. 279. Moreover, a note from his teacher, Ms. Hart, suggests that Jahkori was having a difficult time toilet training, failing to even ask for the toilet when needed. See R. 271-72. This evidence casts doubt on Jahkori's ability to care for himself. The ALJ's decision, however, makes no attempt to reconcile the conflicting evidence in the record, nor does the ALJ adequately explain why he discounts plaintiff's testimony about the severe behavioral problems her son displayed at home.

## CONCLUSION

The court concludes that remand is warranted because the ALJ's reasoning with regard to three domains discussed above did not sufficiently acknowledge and weigh the conflicting evidence contained in the record. Moreover, the ALJ rejected evidence and testimony by various witnesses without making the requisite credibility findings or identifying evidence that could justify rejecting such evidence or testimony. The Appeals Council also erred in denying plaintiff's request for review because the supplemental evidence submitted to the Appeals Council was sufficient to trigger review of the ALJ's decision. For the foregoing reasons, defendant's motion for judgment on the pleadings is denied, the plaintiff's cross-motion for judgment on the pleadings is granted, the Commissioner's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.[4] The Clerk of the Court is directed to enter judgment accordingly.

SO ORDERED.

Allyne R. Ross
United States District Judge

Dated: November 3, 2005
Brooklyn, New York

---

[4]Should the ALJ find that plaintiff is not presently entitled to benefits because Jahkori's behavioral and developmental problems have improved, the ALJ is directed to determine whether plaintiff was entitled to benefits for any past, closed period. See 42 U.S.C. § 416(i)(2)(D); Pena v. Barnhart, No. 01 Civ. 502, 2002 WL 31487903, *11-12 (S.D.N.Y. Oct. 29, 2002) (remanding with instructions to determine whether plaintiff is entitled to "closed period" benefits).

SERVICE LIST:

<u>Plaintiff</u>
Zarita Deas
292 Menahan Street, Apt. 2R
Brooklyn, NY 11237

<u>Counsel for the Defendant</u>
Timothy D. Lynch
United States Attorneys Office
Eastern District of New York
One Pierrepont Plaza
Brooklyn, NY 11201